**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| JANE DOE, individually, and as parent and next friend of JILL DOE, a minor, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CAUSE NO. 1:26-cv-646 |
| _____ | ) |
| LAKOTA LOCAL SCHOOLS; RONALD HENRICH, individually and in his official capacity; ASHLEY WHITELY, individually and in her official capacity; and BILL BRINKMAN, individually and in his official capacity, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL**

Come now Plaintiffs, Jane Doe, individually, and as parent and next friend of Jill Doe, a minor child, and through their undersigned attorneys, file this Complaint for Damages and Request for Jury Trial against Defendants to recover Damages and other relief resulting from the Defendants' tortious conduct and violations of Jill Doe's rights under Ohio Law and the United States Constitution and Code, and to recover for Jane Doe's own derivative loss of the filial consortium of her minor daughter. This action is against Lakota Local Schools (hereinafter "District"); Teacher Ronald Henrich, individually and in his official capacity; Superintendent Ashley Whitely, individually and in her official capacity; and Principal Bill Brinkman, individually and in his official capacity. In support thereof, Plaintiffs respectfully state the following:

**I. INTRODUCTION**

1. This action arises out of the egregious misconduct of District teacher Ronald Henrich ("Defendant Henrich"), who groomed and sexually abused Jill Doe ("Jill"), a minor female student with known, pre-existing vulnerabilities, over the course of three years. This abuse

occurred on District property and on District-licensed devices, applications, and online accounts. The long-term pattern of Defendant Henrich's sexual abuse and grooming, which ultimately culminated in the life-altering sexual abuse of this minor child, was permitted to occur because the District failed to supervise Defendant Henrich and Jill adequately; failed to monitor its own networks and devices; ignored repeated, obvious warning signs of abuse; and after the abuse was uncovered, failed to prevent a known sexual predator from re-entering District property and once again gaining access to Jill.

2. The District continued to inflict additional harm on Jill when it failed to hold Defendant Henrich accountable for his deplorable conduct. The District never placed Defendant Henrich on administrative leave but instead allowed him to quietly retire just weeks after the abuse was discovered by Jill's family and reported to the Butler County Sheriff's Office. Defendant Ashley Whitely ("Defendant Whitely") ignored the parent's repeated requests for discussion and answers regarding this harmful decision by the District. Defendant Whitely and the District further failed to report Defendant Henrich's conduct to the Ohio Department of Education, even after Butler County Children's Services substantiated the abuse on April 17, 2025.

3. Because the District failed to hold Defendant Henrich accountable and prevent him from accessing students even after the abuse was discovered, Defendant Henrich was able to pick Jill up from a required attendance school activity in December 2025 and engage in inappropriate physical contact with her in his vehicle.

4. The District additionally harmed Jill when it discriminated against her for the abuse she suffered. District personnel failed to provide Jill with the necessary accommodations and supportive measures she needed to stay safe at school following the abuse and instead, stigmatized her as a victim of abuse. They treated Jill as if she had done something inappropriate, even though she was the victim of the abuse. In response to this, Defendant Bill Brinkman ("Defendant Brinkman"), willfully and intentionally allowed this discrimination to continue by failing to correct the actions and attitudes of these teachers, allowing Jill to continue to suffer.

5. The abuse Jill suffered at the hands of Defendant Henrich was not the only harm she suffered under the District's direct supervision. In January 2024, while she was being

groomed by Defendant Henrich, she attempted suicide during the school day after she had stockpiled Tylenol she had received from a District nurse over the course of several days. That District nurse failed to properly administer and supervise the consumption of the medication that Jill stockpiled. As a result, Jill was hospitalized after this attempt, and she spent four days in in-patient psychiatric care.

6. The harm suffered by Jill was entirely preventable. The District's failure to supervise students and staff, failure to train staff to prevent and recognize abuse, failure to monitor its own networks and devices, failure to follow safety protocols for administering medications at school, and failure to allow a student with disabilities to have equal access to the District's services constitutes violations under multiple theories of law including the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, Section 1983, and state tort law.

7. Jill's mother, Jane Doe, has suffered her own distinct and compensable injury. As the parent of a minor child who was intentionally and negligently injured by Defendants, she has been deprived of the services, society, companionship, comfort, love, and solace of her daughter. Ohio law recognizes a parent's independent, derivative claim for loss of filial consortium arising from a third party's tortious injury to the parent's minor child.

8. Defendants Henrich, Whitely, and Brinkman are sued both in their individual and official capacities. Defendants Henrich, Whitely, and Brinkman are not entitled to immunity in this matter because their acts alleged in this Complaint for Damages and Jury Trial Demand were committed outside the scope of their employment, with malicious purpose, in bad faith, and in a wanton or reckless manner. Ohio Rev. Code Ann. § 2744.03(6)(a)-(b).

## II. JURISDICTION AND VENUE

9. Jurisdiction over federal civil rights claims is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a).

10. Venue is proper in this Division pursuant to 28 U.S.C. § 1391(b)(1) and S.D. Ohio Civ. R. 82.1(c).

## III. PARTIES

*Plaintiffs*

11. Jill is a minor child, and was a minor child at all relevant times, enrolled as a student with the District, a public-school corporation located within Butler County, Ohio.

12. Jill has multiple disabilities which affect her judgement and make her highly susceptible to abuse. This includes anxiety, depression, and other mental health issues.

13. Jill is a qualified individual with multiple disabilities pursuant to the ADA because Jill's conditions constitute physical or mental impairments that substantially limit one or more major life activities.

14. Jane Doe ("Ms. Doe") is the parent and legal guardian of Jill and was the parent and legal guardian of Jill during the acts alleged against the Defendants in this Complaint for Damages and Jury Trial Demand. Ms. Doe brings this action both individually, in her own right, for her loss of filial consortium, and as parent and next friend of Jill.

15. Jill and Ms. Doe are residents of the County of Butler County, State of Ohio, and were residents at all times referenced herein.

16. Pseudonyms are being used for Jill and Ms. Doe as Jill is a minor with disabilities, and this matter involves the grooming and sexual abuse of a minor child within a close-knit public-school community.

*Defendants*

17. Defendant Lakota Local Schools is located in Liberty Township, Ohio, within Butler County, with its principal office located at 5572 Princeton Road, Liberty Township, Ohio 45011-9726.

18. The District is responsible for Liberty Junior School, located at 7055 Dutchland Boulevard, Liberty Township, Ohio 45044-9042.

19. The District is responsible for Lakota East Freshman Campus, located at 7630 Bethany Lane, Liberty Township, Ohio 45044.

20. The District is responsible for Lakota East High School, located at 6840 Lakota Lane, Liberty Township, Ohio 45044-9578.

21. The District is a local education agency within Ohio and is a recipient of federal financial assistance.

22. The District is a "political subdivision" of the State of Ohio, as defined by O.R.C 2743.01(B).

23. Defendant Henrich was a teacher assigned to work as an Intervention Specialist for the District's gifted program at Liberty Junior School at all relevant times. In this position, he acted under color of law in his official capacity as an employee of the District. His duties included facilitating advanced learning opportunities for "gifted" students, providing small group instruction for gifted students, and other duties necessary to the operation of the District's gifted program. Defendant Henrich is sued in both his official capacity as an employee of the District and his individual capacity.

24. Defendant Whitely served as the Superintendent of the District during all relevant times. Defendant Whitely acted under color of law in her capacity as Superintendent of the District. She is the District board's "chief administrative officer" according to Po 1230 of District's policy manual and is responsible for developing and implementing District policies. Her responsibilities included ensuring that every student within the District was afforded equal access to public education and a safe, supportive learning environment. As Superintendent, she bore ultimate responsibility for hiring, firing, training, and supervising District staff. She was additionally responsible for ensuring compliance with all applicable local, state, and federal laws, including, but not limited to, the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. She was also tasked with ensuring that all District personnel adhered to statutory and regulatory requirements, received adequate training and guidance, and maintained policies which ensured that District students would be kept reasonably safe at school. Defendant Whitely is sued in both her official capacity as an employee of the District and her individual capacity.

25. Defendant Brinkman is and at all relevant times was, the Principal at Lakota East Freshman Campus. During that time, he acted under color of law in his official capacity as Principal. His duties included hiring, firing, training, and supervising teachers, staff, and other employees necessary for the operation of the school. These duties also included taking reasonable precautionary measures to keep children safe from abuse at school.

Additionally, Defendant Brinkman was responsible for carrying out the policies of the District and the State of Ohio's Department of Education and ensuring the school's compliance with federal and state laws, including the ADA and Section 504. He was also tasked with ensuring that District staff and cooperative employees under his supervision followed the requirements of the law and providing the necessary guidance, training, policies, structure, consistency, and behavioral supports that would enable children with disabilities to have equal access to the school's services, programs, and activities. Defendant Brinkman is sued in both his official capacity as an employee of the District and his individual capacity.

## IV. ALLEGATIONS AND STATEMENTS OF FACT COMMON TO ALL COUNTS

26. When Jill attended Liberty Junior School in the seventh grade during the 2022-2023 school year, she was just thirteen years old. At that time, she had already faced many hardships and challenges in her young life, including sexual abuse at the hand of her father when she was a young child. This abuse was substantiated by Butler County Children's Services. Jill also has a history of struggling with her mental health and engaging in self-harm. She struggles to form healthy, lasting friendships with her peers and lacks meaningful connection and relationships with others. All of this caused Jill to be particularly vulnerable to abuse.

27. During the 2022-2023 school year, Jill was dating a boy in her class who was in the District's "gifted" program. Jill began going with the boy to the study hall period which was reserved for the gifted program. Defendant Henrich, a teacher who worked in the District's gifted program at Liberty Junior School, allowed Jill to attend this period instead of her regularly scheduled study hall period, even though she was never designated as a gifted student. The teachers responsible for supervising Jill in her assigned study hall period never investigated this situation or attempted to redirect Jill to her assigned location. They turned a bind-eye toward her absence from study hall.

28. During her attendance in the "gifted" program, Defendant Henrich began showing Jill special attention and developing a relationship with her. This relationship soon extended beyond school hours when Jill and Defendant Henrich began messaging each other

frequently on the District's Remind app. This District -wide app was used by the District for student/teacher communications. However, the District failed to monitor communications within the app or implement effective policies to provide safe boundaries for student/teacher communications.

29. In these messages, Jill shared many very personal struggles with Defendant Henrich, including her ongoing battles with anxiety and self-harm. She also shared that she had been previously sexually abused by her own father. Instead of acting in Jill's best interest and seeking help for her, Defendant Henrich betrayed the trust she had placed in him. He exploited Jill's vulnerability and his own position of authority and began grooming, manipulating, and, eventually, sexually abusing her.

30. Jill's mother, Ms. Doe, noticed that her daughter was spending excessive amounts of time on the Remind app when she reviewed Jill's weekly screen time report. She discovered the reason for this was the extensive communication she was having with Defendant Henrich. Ms. Doe was concerned with the extent of communication that her daughter was having with a male teacher, and she talked to Jill about limiting her communication with Defendant Henrich on Remind. Ms. Doe was hesitant to cut off communication entirely between Jill and Defendant Henrich because Jill lacked consistent relationships, and her mother felt that she could benefit from a mentor as long as healthy boundaries were put in place.

31. Despite the frequency and personal nature of the messages between Defendant Henrich and Jill on the Remind app, the District never investigated this relationship or raised any concerns about this developing situation. If the District had monitored the activity on the Remind app, this unsafe dynamic could and should have been recognized immediately, and the District could and should have intervened  and  prevented the devastating harm that Jill and her mother endured.

32. During Jill's eighth grade year, she continued to attend the meetings for the "gifted" program. During this school year, Jill began missing more of her regularly scheduled class time because she was being pulled from class by Defendant Henrich to participate in the "gifted" program. Ms. Doe is still not aware of how often Jill missed class because the District never provided her with any clear information on when these "meetings" occurred

and what went on in these "meetings." The only information she received about the "meeting" times for the program was from Jill.

33. On January 22, 2024, Jill ingested 4,500mg of Tylenol at school in an attempt to end her life. She saved up Tylenol pills that she received from a District nurse over the course of several days. The nurse failed to monitor Jill to ensure that she ingested the Tylenol each time it was administered, and so Jill was able to stockpile the medication. Jill then took all of the pills she had saved at one time on January 22, 2024. She began to experience severe stomach pain and dizziness and then reported to the nurse and a District guidance counselor what she had done and that her intent was to end her life. Jill was taken to the hospital and was then admitted for four days in psychiatric care for crisis stabilization.

34. While receiving inpatient treatment, Jill requested to be able to contact Defendant Henrich. Defendant Henrich also reached out to Ms. Doe at this time requesting to speak with Jill. Ms. Doe denied these requests and did not include Defendant Henrich on Jill's approved contact list at the hospital.

35. Despite the fact that Jill attempted to take her own life at school, the District failed to put any corrective measures in place to monitor her when administering medication. In October 2025, Jill participated in an overnight District-sponsored band trip to Florida. Jill takes prescribed anxiety medication on an as-needed basis, which was in the custody of a District nurse during the trip. Rather than dispensing Jill's medication herself and monitoring her while she took it, the nurse handed Jill the bag of medications for all students, directed her to search the bag for her own medication, and allowed her to self-administer her own medication. The nurse also failed to monitor Jill closely as she did this.

36. This lackadaisical procedure was highly inappropriate, particularly for a student who had a known history of abusing medication at school.

37. The students returned from the band trip on October 19, 2025. Ten days later, on October 28, 2025, Jill was experiencing anxiety at school and visited the District nurse's office to take her anxiety medication. However, she was informed that the nurse who had accompanied the students on the band trip had failed to check the students' medications back into the office upon their return and as a result Jill's prescribed anxiety medication was unavailable when she needed it. Although the nurse had returned from the trip ten days

ago, and the students' medications were still unavailable, the District never informed Ms. Doe that Jill would not have access to her medication at school when she needed it. Instead, Jill was left to suffer in silence for the remainder of the school day without her needed medication. This also further demonstrates the District's continued lack of care in managing and administering student medications.

38. During the summer between Jill's eighth and ninth grade years, Defendant Henrich continued to message Jill frequently even while school was not in session. In June 2024, he sent her a photo of himself on vacation through the Remind app. The two then continued to playfully discuss how they were messaging so frequently and how inappropriate it was for a teacher to send a photo to a student. During this time, Jill and Defendant Henrich's messages on the Remind app were increasingly personal in nature including messages like "good morning" and "good night" and discussing what each of them was eating for dinner. Ms. Doe viewed these messages and became even more concerned about the lack of boundaries of the relationship. At this point, Ms. Doe implemented restrictions on Jill's device that prevented her from accessing the Remind app outside of school hours.

39. Even though this extensive communication was going on through an app that was licensed by the District, no District employee ever monitored these messages or raised any concerns about the highly personal relationship that a male teacher was developing with a vulnerable female student. It took the proactive intervention of the parent to place any boundaries on this clearly problematic dynamic. Unfortunately, Ms. Doe could only do so much to limit the contact between Defendant Henrich and Jill as the District was solely responsible for supervising them during the school day and during school activities when Ms. Doe had limited access to her daughter.

40. During the 2024-2025 school year, when Jill began ninth grade, which was held in a separate building at the Lakota East Freshman Campus, there was a new teacher assigned to the gifted program. Defendant Henrich was not assigned to do any work with the gifted program at Jill's ninth grade building. He was assigned to a different building. Despite this, Defendant Henrich would make a special trip to Jill's building each Friday to eat lunch with her alone in the "mindfulness room," often with the door closed. He would even bring her lunch which he purchased himself outside of the school.

41. The District permitted these secluded lunch meetings to take place with no oversight and no notification to Ms. Doe. The District allowed Defendant Henrich to visit the ninth grade building each week, even though he was not assigned to work in that building and had no official responsibilities there. When Ms. Doe learned about these lunch meetings from Jill, she asked Defendant Henrich why he was still eating lunch with Jill even though he was not responsible for the "gifted" program in Jill's building. Defendant Henrich informed her that all students in accelerated courses received these "services." Ms. Doe was extremely uncomfortable with this clearly inappropriate dynamic, and she told Jill that she was not to eat lunch with Defendant Henrich in a one-on-one setting, and she should only purchase her lunch from the school cafeteria and not allow Defendant Henrich to bring her lunch.

42. The District ended its contract with the Remind app at the beginning of the 2024-2025 school year. At that point, Defendant Henrich began contacting Jill through her District email account and also through Jill's District Google Docs account. The daily messages and personal conversations continued on both of these District-sponsored accounts on Jill's District-managed Chromebook. The District still failed to monitor these accounts or implement any safety restrictions.

43. During Jill's ninth grade year, Defendant Henrich continued to pull her out of class to meet with him under the pretense of activities for the "gifted" program and "mentoring" for her anxiety issues. He was doing this even though he was not responsible for the gifted program at Jill's building nor had Jill been identified by the District as "gifted." Jill began missing so much class time due to these "meetings" with Defendant Henrich that her other teachers warned her that there would be consequences if she continued to be absent.

44. Despite the verbal warnings from Jill's teachers about her absence from class, no one from the District reported these concerns to Mrs. Doe. Mrs. Doe only learned of the teachers' warnings from Jill. When she questioned Defendant Henrich about this, Mrs. Doe could not get a clear answer from him about how often he was pulling Jill from class. He informed her that the reason these extensive one-on-one meetings were needed was because of Jill's anxiety and mental health issues for which he was providing "mentoring." Mrs. Doe continued to feel uncomfortable with Defendant Henrich's level of involvement with Jill, but she again trusted that the District would provide appropriate supervision to keep Jill

safe at school. Jill was also in a very delicate state at this time as she had been struggling with her mental health due to her suicide attempt and psychiatric hospitalization the previous year. Because of this, Mrs. Doe did not want to eliminate Jill's access to a trusted support person at school, particularly given that Jill's prior suicide attempt occurred while she was at school.

45. As the school year progressed, Defendant Henrich became increasingly bold in his actions toward Jill, to the point where he was essentially stalking her. Mrs. Doe witnessed Defendant Henrich on several occasions coming to visit Jill after band practice. Band practice was held in a separate building from the ninth-grade building, and Defendant Henrich had no reason to be there. Yet he would be present and would always say that he was "just in the area" and wanted to stop by to say "hi" to Jill.

46. On January 29, 2025, Jill and her mother attended a scheduling information event for Jill's upcoming tenth-grade year at Lakota East High School. When Jill and Ms. Doe arrived, Defendant Henrich was seated at a table in the corner working on his computer, not participating in the event or speaking to any other families. Once he saw Jill and her mother, he approached them and offered to personally accompany and escort them around the event. Ms. Doe declined. When they were getting ready to leave, Defendant Henrich again approached them and asked to speak with Ms. Doe regarding his "role" with Jill. Ms. Doe was very uncomfortable during this conversation as Defendant Henrich expressed to her that he had lost weight and sleep over worrying that Mrs. Doe was uncomfortable with his relationship with Jill. He also told her that he missed how things used to be when teachers were permitted to have more contact with students, including driving students alone in their vehicles. As a teacher herself, Ms. Doe found the tone of this conversation very disconcerting. Not wanting to prolong the conversation, Ms. Doe simply told Defendant Henrich that they were trying to limit Jill's interactions with him to diversify her relationships.

47. The next day, on January 30, 2025, Defendant Henrich, without Ms. Doe's knowledge or consent, reached out directly to Jill's therapist. He informed the therapist of some ongoing "developments" in Jill's mental health struggles. This conduct further represents a serious

breach of appropriate professional boundaries and highlights Defendant Henrich's attempts to undermine and circumvent Ms. Doe's role and authority as Jill's parent.

48. On March 9, 2025, unbeknownst to anyone in Jill's family, she and Defendant Henrich arranged to meet at a local driving range. Jill asked her grandfather to take her to the driving range on that date at a particular time, and then she informed Defendant Henrich, who planned to be there at the same time. When Jill and her grandfather ran into Defendant Henrich at the driving range, Defendant Henrich feigned that it was a "coincidence" running into Jill there.

49. On March 14, 2025, Jill volunteered at an event put on by the gifted program for "Pi Day." Jill was only able to provide vague details about this event, such as who would be attending and what time the event ended. Because of this, Ms. Doe and Jill's stepfather had a bad feeling about leaving her at the event unattended. Trusting their parental instincts, they returned to the event shortly after they had dropped her off. When they entered the event, they found that Jill was running a tic-tac-toe game alongside Defendant Henrich and his wife. The parents found this dynamic odd as Jill was not interacting with any of the other students from the gifted program. Defendant Henrich then showed Ms. Doe a photo he had taken of Jill sitting next to his wife. This also struck Ms. Doe as odd, particularly coupled with all the other recent events. She requested that Defendant Henrich send her the photo and delete it from his phone as she was uncomfortable with him retaining a personal photograph of Jill.

50. Less than a week later, on March 20, 2025, Ms. Doe made a horrifying discovery on Jill's Chromebook, which was provided by the District. Ms. Doe noticed that Jill was typing very fast on her Chromebook, and she requested to do a "laptop check." Ms. Doe routinely did this to monitor Jill's devices and online activity. Jill closed out her tabs before handing the Chromebook to her mother. Ms. Doe unlocked the Chromebook and opened Jill's browser where a saved tab opened automatically to a live document on a site called Canva, which is an online graphic design platform and publishing tool.

51. Ms. Doe then discovered that the document was shared with Defendant Henrich who was actively typing and immediately deleting extremely sexually graphic content on the live document he shared with Jill. Ms. Doe and her husband immediately began recording the

screen and captured nearly an hour of these explicit messages on video as Defendant Henrich continued to type and delete. These messages included graphic depictions of Defendant Henrich engaging in rough sexual foreplay and penetrative sexual acts with Jill. He refered to these acts multiple times as "punishment" and describes Jill being in pain. The messages were so graphic and distressing that Ms. Doe began to experience severe emotional distress, requiring her to leave the room while they were being recorded.

52. The following is a portion of the graphic messages typed by Defendant Henrich which were recorded by the parents.[1]

> Then I push it back out again tugging on your erct nipple
>
> It's at this point you start to moan in pain but also some pleasure It's time for punishment #3
>
> I get behind you standing. You kneeling. I tap your as$
>
> Now a bit harder. On the right side.
>
> It's getting redder and redder
>
> Its here that u switch your left side. I backhand it with ting ting.
>
> Its stinging because of the way I'm smacking it
>
> You are starting to writhe a bit
>
> I kneel next to you and pull your hair back so that you can see my face At that point I put my pe
>
> On your forehead and rest it there so you can see it Your future. right there
>
> I then take my hands and put directly into your vagina without Giving you lubrication
>
> It's so cruel but it goes in anyway
>
> Tight but
>
> Your fingers I take and put them on my chest My niplles
>
> And then I smack your left arm away causing the chain reaction on your right niplle Its here that I decide to take those fingers inside and move my thumb up near your You hear me ask you were you bad today?
>
> Do you think you deserve this? And I show you my d
>
> I insert my fingers deeper inside you
>
> I put you with your right leg over your leg but still on all 4s

---

[1] Spelling and grammar errors are original.

It's causing a weird angle so I move your

Crossed leg further back Creating a slit

That will be suitable for my tastes

Without warning I quickly stand and shove my penis Inside you

Then I start rocking your one leg And then I also grab your left arm I move that outward

Im able to see you moving and hearing you moaning Riding to the rhythm of my pace

As u thrust I pull harder and away on your left arm, I also pull your right leg further back Pushing harder

Then I pull out and then just give you the tip Back in fully

Out all the wsy Then the tip

Back again. The tip Back jn

My right leg then pushes your left leg outward stretching your groin

It's heaving now in your chest. Causing hives to break out

I smack your stomach Then I take my right hand

And put it around your waust

As that happens you'll see me pushing. Feel me pushing. And then retreat

Tip shaft tip shaft tip shaft Inserting in and out

Do

You think you have earned this I ask? Do you?

It's time for uou

You start to arch your back as I pull your hsir I keep at it pushing on andvout

It's getting closer as you feel the throbbing from your ukle It's ready to explode

It's so g It's so good

Feel it feel my member Inside you

You can tell I'm ready

It's there. Throbbing at the head Pushing on your gspot Relentless

It won't leave it It's hsppening

Breathe shallow and then deep breaghs Trying to catch it

But you can't

I grab your left arm to tap that erect right niplle But the keeps going vrhrobbing

It's like you can feel your heartbeat in your clit It's so good

My oen

Is still touching your gspot. Rubbing on it

It's going to happen. Soon

In out in out in out

Now cum. Let me hear you moan Mmmm

Cum big

Then as you cum I hold it inside you Feeling you as you do

Then I take my pro

Tans I put it in your mouth. I pull you hair Away

And the. I start to feel the moisture in your mouth It is happening for me now too. Taste it

As you deep the air AS you deep throat

And allow that to start to release You can taste it

Yum. Yum Cum

Licking likcing in circles in my head On my head

It's enough to drive me crazy and I let u have it all It's 4 5 thrusts later and I'm still cumming

Oh so good.

Then I push it back to normal

53. As the messages were being recorded, Ms. Doe and her husband immediately called the Butler County Sheriff's Office and reported the explicit content of the messages sent by Defendant Henrich. When the police officers arrived at the family's home, they were able to record additional messages on body worn cameras as Defendant Henrich was still typing when the police arrived.  The next day, March 21, 2025, the officers from the Bulter County Sheriff's Office informed the District of the events and conduct of Defendant Henrich.  The situation was also reported to Butler County Children's Services. The School Resource Officer never contacted Ms. Doe at any point during the investigation, and the District never provided the family with any updates.

54. On March 21, 2025, the day after the messages had been discovered and reported to the District, Ms. Doe received no information or contact from the District regarding how their daughter would be kept safe at school moving forward. Ms. Doe and her husband had to take the initiative and request a meeting with Defendant Brinkman and a District guidance

counselor. During this meeting, Defendant Brinkman informed the parents that Defendant Henrich would immediately be placed on administrative leave until the investigations by the District, the police, and Butler County Children's Services were completed. The District also stated that Defendant Henrich would not be allowed to enter any District buildings during this administrative leave. During this meeting, Ms. Doe informed the District that the only way they felt comfortable allowing Jill to come back to school was if the District could ensure that she did not have access to a Chromebook or any of her District accounts where she would be able to contact Defendant Henrich. The District agreed that this safety measure would be implemented.

55. After March 21, 2025, no one from the District contacted Jill's parents to express concern for Jill's well-being or to provide any updates regarding the District's investigation.

56. After hearing nothing from the District for several weeks, Jill's parents were appalled when reviewing the District's board meeting minutes to discover that Defendant Henrich had not been placed on administrative leave as they had been told, but instead, was granted permission to take leave under the Family Medical Leave Act. This clearly demonstrates the District's attempt to exonerate this known predator and dismiss the situation quietly. Not only was Defendant Henrich permitted to take "medical" leave instead of administrative leave, but less than two weeks after the sexually explicit messages to Jill were discovered and before any of the involved entities had completed their investigations, the District approved his retirement. As a result, Defendant Henrich was permitted to leave the District on his own terms, despite the serious allegations alleged in active and ongoing investigations into his own conduct.

57. After the District had already approved Defendant Henrich's retirement, Children's Services mailed a notice to Ms. Doe informing her that the reported abuse of her daughter by Defendant Henrich had been substantiated.

58. After making this discovery, Jill's parents sent a letter to each member of the District's board on April 28, 2025, expressing their serious concerns about the District's failure to discipline Defendant Henrich and instead allow him to retire. In this letter, they requested answers to several poignant questions including whether Defendant Henrich was ever

placed on administrative leave, whether he was still being paid by the District, and whether he was permitted to continue to access District buildings and accounts.

59. District Superintendent Defendant Whitely responded to the letter weeks later via email on May 8, 2025. Defendant Whitely finally offered to set a time to meet with them regarding their questions. She even stated in her email that she would be addressing the questions instead of the board as the questions related to "daily operations" and not matters for which the board was responsible. This response was extremely cold, calloused, and dismissive. Ms. Doe attempted to call Defendant Whitely at least three times. She even sent Defendant Whitley several windows of availability for a call back. Defendant Whitley only attempted to call Ms. Doe back outside of her designated windows of availability. This demonstrates that Defendant Whitley was either avoiding speaking with Ms. Doe, or, at the very least, failing to give this serious issue the priority status that it warranted. By the time Defendant Whitley finally made a meaningful attempt to connect, Jill's parents had already retained legal counsel, and because of this, did not meet with Defendant Whitely.

60. The District completely failed to recognize the gravity of the abuse that Jill suffered at school while under the District's care. The fact that the District failed to take any meaningful action against Defendant Henrich despite being confronted with documented evidence of his highly inappropriate and sexual communications with a minor student was deeply troubling and caused further emotional distress to both Jill and Ms. Doe.

61. By information and belief, because the District failed to report Defendant Henrich's conduct to the Ohio Department of Education as required by Ohio Rev. Code Ann. § 3319.313(B)(2), Defendant Henrich was permitted to voluntarily surrender his teacher license instead of facing any disciplinary action at the state level.

62. The District even failed to cooperate with necessary steps required to allow Jill to safely return to school. Ms. Doe prohibited Jill from using a Chromebook after the messages with Defendant Henrich were discovered, and the District was completely uncooperative with this safety measure for the remainder of the school year. In at least one instance, Jill was permitted to use a school computer during study hall where she had access to all of her District accounts, the same accounts that Defendant Henrich had just used to groom and abuse her. Additionally, many of Jill's teachers complained that they were inconvenienced

by Jill's inability to have a Chromebook for their classes. They stigmatized and blamed Jill for not being able to be trusted with a Chromebook, as if the abuse was somehow her fault. The teachers made Jill feel like she was being disciplined for using technology inappropriately even though Jill was the victim of a perverted and abusive teacher.

63. Jill was highly embarrassed by the treatment she received from her teachers and constantly worried about what her peers must have been assuming about her. Despite the knowledge that Jill was not permitted to use a Chromebook to complete homework or daily assignments online, many of her teachers failed to provide paper version of the assignments for Jill to complete. This caused constant strife between Ms. Doe and the District as she fought to keep her daughter safe and allow her an equal chance to participate in her education. Defendant Brinkman failed to intervene on Jill's behalf or address and correct the prejudicial attitudes of her teachers. Instead, he quietly printed Jill's assignments for her and allowed her to be subjected to the daily stigma.

64. Jill's response to the grooming and horrible abuse she suffered at the hands of Defendant Henrich is heartbreaking. She still claims that she loves him and that everything that bad happened is somehow her fault. This response illustrates the devastating impact that this prolonged, systematic abuse has had on Jill. She is isolated and depressed as she is unable to form healthy friendships and relationships. Jill stayed home all summer in 2025. She was left so vulnerable and unstable in the wake of the investigation that she could not make prudent decisions for herself. She was not able to participate in activities with peers, and had to quit her new job at a pizza restaurant.

65. Jill started the tenth grade in August 2025 at Lakota East High School. She was provided with a Chromebook with the stipulation expressed by Ms. Doe, that each of Jill's existing District accounts, including her email and Google Docs accounts, which were used to communicate with Defendant Henrich, were deleted and she would be given brand new accounts. After Jill went several weeks without a Chromebook and again struggled to receive paper assignments, the District finally agreed and provided this necessary safety measure for Jill.

66. The emotional damage that Jill has suffered cannot be understated. This abuse will have continued and lasting effects on her development and relationships as she struggles to

navigate high school and safely gain independence safely. The gravity of this harm and the imminent danger of Jill's susceptibility to further abuse was revealed within weeks of her starting the tenth grade at Lakota East High School. Ms. Doe received a phone call from the principal informing her of a concerning situation. A male teacher had reported to the principal that Jill was frequently coming to visit him in between classes and was attempting to stay late after school to spend time with him. Thankfully, this male teacher was responsible and reported this concerning behavior promptly. However, Jill's behavior demonstrates the lasting impact that Defendant Henrich's abuse and influence has had on her ability to develop safe boundaries.

67. Shockingly, even after the District was fully aware of Defendant Henrich's long-term abuse of Jill and Jill's continued susceptibility to further abuse, the District still failed to supervise Jill or prevent this dangerous predator from entering District property and gaining access to Jill.

68. In December 2025, Jill used another student's phone to contact Defendant Henrich during the school day. A student reported this to the District, but the District never informed Mrs. Doe. Instead, the District reported this to law enforcement completely leaving Mrs. Doe in the dark and unable to take action to protect her daughter.

69. A few days later, while Jill was supposed to be at band practice, a class activity where her attendance was mandatory and should have been recorded, it was discovered that she was picked up from the school by Defendant Henrich in his vehicle. According to Jill, Defendant Henrich drove her to the park, and the two "laid together." He then brought her back to the school where she was picked up.

70. The District again failed to supervise Jill despite known safety concerns and neglected to notify Ms. Doe that Jill was not in attendance at band practice. Ms. Doe did not find out about her absence until the next day when speaking with the band director who casually mentioned that Jill had not been at practice the previous day.

71. Because the District was either unwilling or unable to prevent Defendant Henrich from accessing Jill at school, Ms. Doe sought a protection order from the court for her daughter. In January 2026, the Butler County Court granted a protection order prohibiting Defendant Henrich from contacting Jill.

72. Ms. Doe repeatedly sought information and records from the District regarding Jill's movements, phone usage, and absences from class, but the District was highly resistant to providing information or documenting concerns in writing. District employees repeatedly minimized the situation and refused to provide Ms. Doe with records necessary to protect her daughter and monitor her safety. School administrators further admitted to Ms. Doe that they could not guarantee that Jill would remain in the building if she chose to leave campus, and this confirmed the District's inability to safely supervise Jill.

73. Upon information and belief, the District's awareness of Defendant Henrich's propensity for boundary-violating conduct toward female students predated his abuse of Jill. A former member of the District's Board of Education has publicly stated that Defendant Henrich entered the locker room while members of the District's girl's tennis team were undressing, and that he was subsequently removed from his position as coach of the girl's tennis team as a result.

74. Despite the District's repeated failures which demonstrate an obvious need for alternative supervisory methods, the District continued to display an apathetic attitude toward student safety. The District implemented digital hall passes during the Spring 2026 semester; however, many teachers either failed to use the system entirely or used it inconsistently, leaving Ms. Doe with continuing concerns regarding supervision and accountability within the school building.

75. As a direct and proximate result of the abuse Jill suffered and Defendants' acts and omissions, Ms. Doe has been deprived of the normal services, society, companionship, comfort, love, and solace of her minor daughter. The grooming and sexual abuse, the resulting psychological deterioration, the social isolation, and Jill's impaired ability to form safe and healthy relationships have profoundly disrupted the parent-child relationship between Ms. Doe and Jill, causing Ms. Doe her own distinct and ongoing injury.

76. The District's failures are not isolated to a single rogue teacher. This matter represents systemic cultural issues within the District where male teachers are trusted and protected at the expense of student safety. On August 4, 2025, another District teacher, Justin Daniel Dennis, was arrested and charged with sexual battery after the Butler County Sheriff's Office received information about an inappropriate relationship between Mr. Dennis and a

female student during the 2021-2022 school year. Mr. Dennis was the student's adviser and mental-health mentor, a role of heightened trust, and was discovered to have carried on a month's-long sexual relationship with the seventeen-year-old student beginning in December 2021, including sexual contact in his classroom and at his residence. As with Defendant Henrich, the conduct went "undiscovered" by the District for years and was revealed only when it was reported to the police. Mr. Dennis was indicted on eight counts of sexual battery, pleaded guilty, and received the maximum sentence of four and one-half years in prison, along with lifetime Tier III sex offender registration.

77. Mr. Dennis's conduct is not an aberration. It is the latest in a documented, decades-long pattern of staff-student sexual misconduct within the District that the District has repeatedly chosen to manage quietly, such as allowing Defendant Henrich to retire rather than penalize with disciplinary action and implement safety measures to prohibit these events from transpiring.

78. In 2023, Nick McGill, a choir teacher at Lakota West High School, resigned in March 2023 following a second investigation into his alleged relationship with a recent graduate. The District had investigated Mr. McGill nearly two years earlier, in July 2021, allegedly after photographs circulated showing him shirtless in bed on a FaceTime call with the recent graduate. Despite this evidence, the District closed that earlier inquiry with only a written reprimand, characterizing the conduct as "poor judgment," and returned him to the classroom. As with Defendant Henrich, the District possessed early warning signs of misconduct and failed to act.

79. In 2022, the District's own chief executive, then-Superintendent Matt Miller, became the subject of a sexual-misconduct complaint made to both the District's Board and the Butler County Sheriff's Office, alleging that he had solicited sexual scenarios involving the molestation and recording of three minor District students. The District allegedly narrowed its inquiry to the limited question of whether a work device had been used, cleared Mr. Miller on that basis, and returned him to his post. He resigned in January 2023.

80. This pattern of inappropriate action and response to allegations of misconduct involving minors extends even further. George Merk, a math teacher at Lakota West High School, was suspended in 2012 for alleged sexual communications with students, conduct the then-

Superintendent described as "unacceptable, insubordinate, deceitful and unprofessional." After serving only a forty-five-day license suspension, Mr. Merk was returned to a District classroom and permitted to continue teaching until his 2022 indictment for reproducing videos of minors engaged in sexual conduct.

81. In 2012, Robert Supinger, a long-term substitute teacher at Lakota West High School, allegedly carried on an inappropriate relationship with a female student and ultimately had his teaching license revoked by the Ohio Department of Education.

82. In 2006, Angela Johnson, a teacher at Lakota East High School, was arrested and charged with attempted sexual battery after a school resource officer recovered gifts and messages she had sent to a male student; she surrendered her teaching certificate as part of a plea agreement.

83. These multiple incidents, spanning roughly two decades and multiple District buildings, are not isolated lapses. They reflect a recurring institutional response in which the District has repeatedly failed to detect staff-student sexual misconduct, failed to act on early warning signs, or permitted offending employees to resign, retire, or return to the classroom rather than confronting the misconduct as the child-safety crisis it represented. Defendant Henrich's abuse of Jill and the District's response to it aligns with this pattern.

84. It is well established that teenagers between the ages of 12 and 17 are at the greatest risk of child sexual abuse.[2] Further, the perpetrators of child sexual abuse are almost always individuals who know the victim and have regular, sanctioned access to the victim.[3] Because of these sobering facts, schools, particularly middle schools and high schools, have a critical responsibility to be on high alert for any signs of suspicious behavior that may indicate abuse.

85. The District's clear pattern of failing to be vigilant in monitoring student/teacher relationships is inexcusable. In both Defendant Henrich and Mr. Dennis's cases, the long-term abuse and highly inappropriate communication that was occurring under the District's care during school hours and on District-controlled accounts and devices was never even

---

[2]Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sex Offenses and Offenders (1997).

[3]Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sexual Assault of Young Children as Reported to Law Enforcement (2000).

discovered by the District. This demonstrates a pattern of gross negligence and reckless disregard for student safety.

86. The District took no action to discipline Defendant Henrich despite the egregious nature of his actions and the fact that he was in clear violation of at least two District policies. Board Policy 3213 (Student Supervision and Welfare) requires that "each instructional staff member shall maintain the highest professional, moral, and ethical standards in dealing with the supervision, control, and protection of students on or off school property," and expressly prohibits staff from "inappropriately associat[ing] with students at any time in a manner which may give the appearance of impropriety, including, but not limited to, the creation or participation in any situation or activity which could be considered abusive." Board Policy 7540.04 (Staff Technology Acceptable Use and Safety) governs staff use of District-issued and personal communication technology in connection with students and restricts the use of District technology resources and social media platforms for non-educational, personal communications with students.

87. Defendants Henrich, Whitely, and Brinkman are personally liable for their individual acts and omissions that were manifestly outside the scope of their employment, malicious, reckless, or in bad faith.

## V. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – § 1983 – STATE CREATED DANGER AS TO THE DISTRICT, DEFENDANT HENRICH, DEFENDANT WHITELY, AND DEFENDANT BRINKMAN

88. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

89. Defendants, acting under color of law, deprived Jill of rights, privileges, and immunities secured by the United States Constitution, including the right to due process under the Fourteenth Amendment. Specifically, they violated Jill's right to be free from affirmative actions that increased her vulnerability or placed her in danger, while also depriving her mother of the ability to protect her.

90. Defendants acted with deliberate indifference when they put Jill's safety at risk by subjecting her to an ongoing pattern of grooming and sexual abuse by Defendant Henrich.

91. The District and Defendant Brinkman acted with deliberate indifference when they failed to prevent the sexual abuse of Jill, failed to identify clear signs of abuse, failed to supervise Jill or Defendant Henrich, and failed to intervene to stop the abuse.

92. Defendant Brinkman acted recklessly and in bad faith when he failed to prevent or stop this abuse. This is evident by his lack of response to clear warning signs, such as a male teacher, who had no official business in the school building, coming into the school building to regularly meet alone with a female student.

93. Another recent incident which occurred within the school demonstrates that Defendant Brinkman and the District's failure to address this situation goes beyond mere negligence; it demonstrates a pattern of turning a deliberately blind eye to male teachers sexually abusing female students within the school. Former teacher, Justin Daniel Dennis has recently been indicted on eight counts of sexual battery related to the abuse of one of his female students during the 2021-2022 school year. The District never discovered or addressed this ongoing abuse. Instead, and years later, it was reported to the Butler County Sheriff's Department.

94. Defendant Brinkman intentionally failed to investigate the actions and conduct of Defendant Henrich even after the abuse was discovered and Jill returned to school. Defendant Brinkman increased the harm suffered by Jill when he intentionally allowed teachers in the school to stigmatize and discriminate against her for the abuse she suffered as a victim of Defendant Henrich's abuse.

95. The District, Defendant Whitely, and Defendant Brinkman took no meaningful steps to shield Jill from further harm and trauma when she returned to school after the explicit sexual messages from Defendant Henrich were discovered. Instead, they attempted to quietly dismiss the abuse by failing to investigate the situation, failing to discipline Defendant Henrich, failing to place him on administrative leave, failing to effectively implement a safety plan for Jill, and allowing teachers to discriminate against her for the abuse she suffered.

96. Defendant Whitely acted recklessly and in bad faith when she failed to address this situation in any way or communicate with Ms. Doe. This is demonstrated by her acts and omissions of failing to undertake an investigation; intentionally avoiding Ms. Doe,

allowing Defendant Henrich to take leave under the Family Medical Leave Act the day after the abuse was reported; and failing to place Defendant Henrich on administrative leave. Further, by information and belief, Defendant Whitely, as the chief administrator of the District, failed to report Defendant Henrich's conduct to the Ohio Department of Education as required by Ohio Rev. Code Ann. § 3319.313(B)(2).

97. The District acted with deliberate indifference when it failed to monitor student/teacher communications on the Remind app and other District accounts and devices.

98. Defendants further failed to inform Ms. Doe of the danger her daughter was in at school. She was never informed by the District that Defendant Henrich's practice of regularly pulling Jill from class to provide her with "mentoring" was not a standard service for students in accelerated courses. She was not informed by the District that Defendant Henrich was permitted to make a special trip to school in order to eat lunch in a room alone with her daughter. She was also not informed by the District that Jill's absences from class were so frequent that her teachers were threatening her with consequences.

99. The District acted with deliberate indifference when it failed to safely administer medication to Jill, allowing her to stockpile Tylenol and attempt to take her life during the school day.

100. By their actions and inactions, Defendants affirmatively created and exacerbated the danger Jill faced, making her more susceptible to harm than she would have been had they fulfilled their legal and ethical obligations. The several points of failure in the District's response to this plainly unsafe student/teacher dynamic demonstrate more than a mere isolated lapse in judgment, but rather a broader pattern of systemic recklessness, malice, bad faith, and deliberate indifference by Defendants.

101. The state-created danger caused Jill significant emotional and psychological harm, including social isolation, emotional dysregulation, debilitating anxiety, depression, and inability to develop safe boundaries.

102. Defendants' actions and inactions directly caused Jill to be groomed and sexually abused, causing severe deterioration of her mental health, which will have life-long ramifications.

103. Defendants' deliberate indifference and failure to act not only violated Jill's constitutional rights but also perpetuated a dangerous pattern of allowing male teachers to abuse students without fear of consequence.

104. As a direct result of Defendants' actions and omissions, Jill suffered physical, emotional, and psychological injuries, the effects of which continued to impact her and her mother profoundly.

105. Defendants' conduct constituted recklessness and gross disregard for Jill's safety and well-being that amounts to a state-created danger that could have been, and should have been, prevented.

**SECOND CAUSE OF ACTION – § 1983 – SPECIAL RELATIONSHIP AS TO THE DISTRICT, DEFENDANT HENRICH, DEFENDANT WHITELY, AND DEFENDANT BRINKMAN**

106. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

107. Defendants, acting under color of state law, violated Jill's Fourteenth Amendment right to substantive due process by failing to protect her after assuming a special relationship with her. As a general matter, schools do not always have an affirmative constitutional duty to protect students from harm caused by private actors. However, exceptions arise where a "special relationship" exists between the state and the individual. This special relationship can emerge when the state, through its agents, takes on a custodial role or otherwise places an individual in a circumstance of dependence and vulnerability, limiting the individual's ability to care for himself or to obtain help from others.

108. Defendants created a special relationship with Jill that went far beyond the ordinary student-school relationship. The District allowed Jill to deviate from her standard scheduling and academic programming. First, it allowed her to regularly attend a study hall period for the gifted program even though she was not eligible for the gifted program. Then, it allowed her to be regularly pulled from class for one-on-one mentoring with Defendant Henrich. Finally, it allowed her to eat lunch in a room alone with Defendant Henrich while under the District's care.

109. The Defendants assumed heightened responsibility for Jill by providing exceptions to her schedule and programming that were not permitted for any other student in her circumstances. Defendants additionally assumed heightened responsibility for Jill when they allowed her to meet in a closed room alone with Mr. Henrich, creating a clearly dangerous situation which required a higher level of supervision and safety protocol than other students who were engaging in regular school activities.

110. By undertaking these obligations, Defendants affirmatively created a setting in which Jill and her mother relied on the District not merely to provide an education, but also to safeguard her from foreseeable harm.

111. Defendants' failure to uphold these responsibilities was not a mere omission, but a profound and willful abdication of their custodial role. Despite the District's actual knowledge that Defendant Henrich was taking Jill out of class for unsanctioned mentoring sessions, it allowed her to be left alone with him unsupervised.

112. The District, Defendant Whitely, and Defendant Brinkman acted with deliberate indifference when they failed to shield Jill from further harm and trauma when she returned to school after the explicit sexual messages from Defendant Henrich were discovered. Instead, they attempted to quietly dismiss the abuse by failing to investigate the situation, failing to discipline Defendant Henrich, failing to place him on administrative leave, failing to effectively implement a safety plan for Jill, and allowing teachers to discriminate against her for the abuse she suffered.

113. Defendants acted with deliberate indifference when they failed to prevent the abuse of Jill. Their willful and reckless behavior contravened the very purpose of the special relationship, turning the school from a place of learning into an extremely dangerous environment.

114. The District acted with deliberate indifference when it failed to safely administer medication to Jill at school.

115. Ms. Doe entrusted the District with the care and supervision of her child. She also entrusted the District to safely administer medication to Jill during the school day when Ms. Doe had no access to Jill. By withholding essential information about her whereabouts and activities

at school with a male teacher, Defendants effectively incapacitated her from taking steps to protect her daughter. This concealment compounded Jill's suffering and inflicted severe and lasting emotional distress.

116. As a direct and proximate result of Defendants' breach of this special relationship, Jill's federal constitutional rights were violated. She was robbed of the secure, supportive environment her circumstances entitled her to and was instead subjected to ongoing grooming and sexual abuse that resulted in life-long emotional injuries, which were exacerbated by Defendants' failures to intervene when they had countless opportunities to do so.

117. These violations of Jill's substantive due process rights entitle her to relief under 42 U.S.C. § 1983. Defendants' deliberate indifference, their failure to fulfill duties they willingly undertook, and their conscious concealment of critical information from Ms. Doe, combined to create a profoundly dangerous situation,one that never should have existed in a setting pledged to her protection and support.

## THIRD CAUSE OF ACTION – § 1983 – SHOCKS THE CONSCIENCE AS TO THE DISTRICT, DEFENDANT HENRICH, AND DEFENDANT WHITELY

118. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

119. Defendants, acting under color of state law, deprived Jill of rights, privileges, and immunities secured by the United States Constitution, including her substantive due process rights under the Fourteenth Amendment. Defendants' actions and omissions were not merely negligent or misguided; instead, they were so egregious, arbitrary, and abusive of power as to "shock the conscience." This constitutional protection guards against government behavior that displays a deliberate disregard for human dignity, health, safety, and life.

120. Defendants' deliberate indifference to Jill's suffering manifested in numerous ways that collectively created a dangerous situation and exposed her to escalating harm over the course of three years.

121. Despite the District's knowledge that Defendant Henrich was commandeering Jill's class schedule, frequently meeting with her alone, and frequently messaging her on District

apps, accounts, and devices about personal topics, the District still failed to investigate or intervene in any manner into Defendant Henrich's clearly inappropriate behavior which overstepped the bounds of professionalism and jeopardized student safety. This created an extremely dangerous situation, particularly for a vulnerable student like Jill. The District's failure to supervise Defendant Henrich and Jill over the course of three years is inexcusable and without any reasonable explanation.

122. Defendants' failure to investigate Defendant Henrich, discipline him or place him on administrative leave is similarly inexcusable. He was permitted to take leave under the guise of the Family Medical Leave Act the day after the abuse was discovered and reported to the District. He was not placed on administrative leave, and upon information and belief, the District took absolutely no action to investigate this reported abuse.

123. Defendant Whitely's failure to report Defendant Henrich's documented abuse of a minor student to the Ohio Department of Education further demonstrates that she acted intentionally, recklessly, and in bad faith.

124. Defendant Brinkman's acts of continually allowing Defendant Henrich to enter the school building to eat lunch alone with a female student demonstrates that he acted intentionally, recklessly, and in bad faith.

125. Defendants' conduct was so reckless and utterly indifferent to Jill's rights and well-being that it shocks the conscience. This pattern of conduct directly undermined Jill's constitutional protections and caused her serious long-term harm. Accordingly, their behavior constitutes a violation of 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION – § 1983 – VIOLATION OF EQUAL PROTECTION AS TO THE DISTRICT, DEFENDANT HENRICH, DEFENDANT WHITELY, AND DEFENDANT BRINKMAN

126. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

127. Defendants, acting under color of law, deprived Jill of rights, privileges, and immunities secured by the United States Constitution, including the right to equal protection under the Fourteenth Amendment.

128. The Defendants failed to protect Jill, a young, vulnerable, female student, at school from sexual abuse by Defendant Henrich.

129. Defendant Henrich discriminated against Jill by grooming and sexually abusing by preying on the fact that she was a young, vulnerable, female student.

130. Defendant Brinkman discriminated against Jill for being the victim of sexual abuse at school. He failed to ensure that her safety plan was effectively implemented and continually ratified the discriminatory acts by teachers who failed to provide her with paper assignments and stigmatized her as a victim of sexual abuse.

131. The apathetic and inadequate responses from Defendant Whitely and Defendant Brinkman, after the abuse of Jill was discovered, indicate they assumed Jill was somehow at fault for this abuse and did not deserve an urgent or thorough response.

132. This disparate treatment lacked any rational basis and left Jill more vulnerable to continued harm. The Defendants' actions caused Jill serious long-term suffering.

## FIFTH CAUSE OF ACTION – § 1983 – INADEQUATE POLICIES AND PROTECTION AS TO THE DISTRICT

133. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

134. The District failed to implement adequate policies to address safe administration of student medication, supervision of staff and students, investigation of suspected abuse and grooming, monitoring of District devices, accounts, and apps, implementation of effective safety plans, and disciplinary measures for sexual abuse. These failures directly contributed to the harm Jill suffered.

135. The District's failure to have appropriate policies in place allowed Jill to be groomed and sexually abused over the course of three years despite clear warning signs that she was in danger.

136. The lack of adequate policies, training, supervision, and accountability demonstrated deliberate indifference to Jill's rights, making these systemic failures a driving force behind the violations of Jill's constitutional rights.

**SIXTH CAUSE OF ACTION – DISABILITY DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT AS TO THE DISTRICT**

137. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

138. This claim is brought against the District pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. ("Section 504") and its implementing regulations, 34 C.F.R. § 104 et seq., and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and its implementing regulations, 28 C.F.R. Part 35.

139. The District is a "public entity" as defined by 42 U.S.C. § 12131(1).

140. The District operates a "program or activity" as defined by 29 U.S.C. § 794(b); namely, provision of educational services.

141. The District receives federal financial assistance.

142. Jill is a "qualified individual with a disability" as defined by 42 U.S.C. § 12131(2). She has suffered with serious, documented mental health issues including anxiety, depression, self-harm, and suicidal ideation. These mental health issues substantially limit multiple major life activities for Jill, including but not limited to caring for herself, learning, concentrating, thinking, communicating, and interacting with others.

143. Section 504 guarantees Jill the right to participate, along with nondisabled students, in non-academic and extracurricular activities (e.g., lunch, recess, recreational activities) and services to the maximum extent appropriate to her needs. 34 C.F.R. § 104.34(a), (b).

144. Jill's conditions substantially limit one or more major life activities. She is an "individual with a disability" as defined by 29 U.S.C. § 705.

145. Because of her disability, the District intentionally excluded Jill from participation in or denied her the benefits of the services, programs, or activities of a public entity or intentionally subjected Jill to discrimination.

146. The District excluded and discriminated against Jill when it failed to provide the necessary accommodations that would have allowed Jill to safely return to school after the abuse was discovered and reported to the District. The District failed to prevent Jill from

accessing her District accounts when it allowed her access to a school computer during a study hall period. The District also failed to provide her with paper assignments, an accommodation that was necessary for her to participate in educational activities due to her inability to use a computer at school.

147. The District discriminated against Jill when it allowed its teachers to stigmatize Jill and treat her as if it was somehow her fault that she had been the victim of sexual abuse by a teacher. This discrimination was evident by the teachers' attitudes and verbal comments towards Jill. This was so prevalent that Jill constantly feared that her classmates wondered what she had done wrong to be denied access to a computer.

148. The District discriminated against Jill by reason of her disability in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 et seq. Specifically, the District deprived her of the opportunity to participate in its programs and activities to the same extent as her nondisabled peers by failing to make necessary accommodations.

149. Jill's right to attend public school and participate in its programs or activities free from discrimination based on her disability is a clearly established statutory right of which reasonable school employees would have been aware.

150. The District knowingly and intentionally excluded Jill from participation in, denied her the benefits of, or otherwise subjected her to discrimination under a program or activity which receives federal financial assistance in violation of 34 C.F.R. § 104(a).

151. By denying Jill equal access to educational programs or activities, Defendants discriminated against her because of her disability.

152. Non-disabled persons receive the benefits or services for which Jill is otherwise qualified. However, Jill, solely because of her disability, was excluded from, denied participation in, or denied the benefits of attending school by the District or was otherwise subjected to discrimination by the Defendants.

153. Section 504 also requires educational institutions to provide health-related services essential for students with disabilities to benefit from their education, including the administration of medication and other critical health interventions during the school day. Precedents such as *San Ramon Valley (CA) Unified Sch. Dist.*, 18 IDELR 465 (OCR 1991)

and *Advanced Math & Science Acad. (MA),* 65 IDELR 82 (OCR 2014) reinforce the obligation of schools to deliver these services diligently.

154. The Defendants failed in their duty to Jill on repeated occasions. First, when they improperly administered medication to her in January 2024, allowing her to stockpile Tylenol and purposefully overdoes at school. Then again in October 2025, the D failed to follow appropriate protocols with student medications and failed to provide Jill with her medication when she needed it on October 28, 2025.

### SEVENTH CAUSE OF ACTION – NEGLIGENT CARE AND SUPERVISION/NEGLIGENCE PER SE AS TO THE DISTRICT, DEFENDANT HENRICH, DEFENDANT WHITELY, AND DEFENDANT BRINKMAN

155. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

156. The District was grossly negligent in its failure to supervise students and teachers, monitor its own apps, accounts, and devices; recognize and investigate obvious signs of grooming and abuse; or respond to documented, substantiated sexual abuse of a student by a teacher.

157. The District failed in its duty to provide a safe environment for Jill when her mother, Ms. Doe, had entrusted the safety and security of Jill to the District.

158. The District acted as loco parentis for Jill and had a duty to ensure her health, safety, and welfare. The District was negligent by failing to exercise an ordinary and reasonable standard of care by failing to supervise students and teachers; failing to mitigate abusive and inappropriate behavior by teachers; failing to train and educate school staff on identifying and investigating abuse; and failing to exercise reasonable care in overseeing Jill's safety.

159. Defendant Henrich acted with malicious purpose, bad faith, and in a wanton and reckless manner when he groomed and sexually abused Jill. He leveraged his position of authority and preyed on Jill's unique vulnerabilities, of which he was aware, for his own sexual gratification.

160. Defendant Whitely acted recklessly and in bad faith when she failed to discipline Defendant Henrich for his sexually abusive conduct. It is evident by her conduct that she

willfully worked to dismiss this abuse quietly to protect Defendant Henrich instead of fulfilling her duties as Superintendent. This is demonstrated by:

    a. Her failure to conduct any investigation whatsoever into Defendant Henrich even after the sexually explicit messages were discovered and reported to the District;

    b. Her failure to place Defendant Henrich on administrative leave, allowing him to take leave under the Family Medical Leave Act, instead;

    c. Her failure to discipline Defendant Henrich in any way for his conduct, allowing him to retire within weeks after the incident;

    d. Her failure to report Defendant Henrich's conduct to the Ohio Department of Education; and

    e. Her failure to communicate with Ms. Doe about the abuse.

161. Defendant Brinkman acted recklessly and in bad faith when he allowed Defendant Henrich, who had no official business or responsibilities within the Lakota East Freshman Campus, to continually come into the building to meet one-on-one with Jill. Defendant Brinkman never even investigated this situation. He also failed to investigate the fact that Jill was missing class so frequently that her teachers were issuing warnings or that Defendant Henrich was having personal conversation with Jill on District apps, accounts, and devices. The multiple points of failure in Defendant Brinkman's fulfillment of his supervisory duties over the course of the entire school year demonstrate more than a lapse in judgment or mere negligence.

162. Additionally, Defendant Brinkman's recklessness and bad faith is evidence by a pattern of allowing male teachers to abuse female students, including the recent incident where another male teacher, Justin Daniel Dennis, was indicted for sexual battery of a student over an extended period of time where the District failed to identify or investigate the abuse.

163. The District also failed in its duty to safely administer medication to Jill during the school day, allowing her to stockpile medication and attempt suicide.

164. Jill sustained serious emotional injuries as a direct and proximate result of the District's negligent care and supervision; willful and wanton acts or omissions of individuals employed by the District and the District's wrongful or absent policies and practices.

165. Jill was injured as both a direct and proximate result of the conduct of the Defendants and is entitled to compensation for her injuries.

**EIGHTH CAUSE OF ACTION – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AS TO THE DISTRICT, DEFENDANT HENRICH, DEFENDANT WHITELY, AND DEFENDANT BRINKMAN**

166. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

167. The Defendants owed Jill a duty of care to provide her with a safe environment at school.

168. The Defendants breached that duty when they allowed her to be groomed and sexually abused by Defendant Henrich; they then exacerbated the harm she suffered by failing to respond to the documented report of sexual abuse and discriminated against her as a victim of sexual abuse.

169. The District acted as loco parentis for Jill and had a duty to ensure her health, safety, and welfare. The District was negligent by failing to exercise an ordinary and reasonable standard of care when it failed to supervise Jill and Defendant Henrich; failed to mitigate abusive and inappropriate behavior by Defendant Henrich; failed to train and educate school staff on identifying and investigating abuse; and failed to exercise reasonable care in overseeing Jill's safety.

170. Defendant Henrich acted completely outside the scope of his employment with malicious purpose, bad faith, and in a wanton and reckless manner when he groomed and sexually abused Jill. He leveraged his position of authority and preyed on Jill's unique vulnerabilities, of which he was aware, for his own sexual gratification.

171. Defendant Whitely acted recklessly and in bad faith when she failed to discipline Defendant Henrich for his sexually abusive conduct. It is evident by her conduct that she willfully worked to dismiss this abuse quietly in order to protect Defendant Henrich instead of fulfilling her duties as Superintendent. This is demonstrated by:

    a.    Her failure to conduct any investigation whatsoever into Defendant Henrich, even after the sexually explicit messages were discovered and reported to the District;

    b.    Her failure to place Defendant Henrich on administrative leave, allowing him to take leave under the Family Medical Leave Act, instead;

    c.    Her failure to discipline Defendant Henrich in any way for his conduct, allowing him to retire within weeks after the incident;

    d.    Her failure to report Defendant Henrich's conduct to the Ohio Department of Education; and

    e.    Her failure to communicate with Ms. Doe about the abuse.

172. Defendant Brinkman acted recklessly and in bad faith when he allowed Defendant Henrich, who had no official business or responsibilities within the Lakota East Freshman Campus, to continually come into the building to meet one-on-one with Jill. Defendant Brinkman never even investigated this situation. He failed to investigate the fact that Jill was missing class so frequently that her teachers issued several absence-related warnings. He also failed to investigate that Defendant Henrich was having personal conversation with Jill on District apps, accounts, and devices. The multiple points of failure in Defendant Brinkman's fulfillment of his supervisory duties over the course of the entire school year demonstrate more than a lapse in judgment or mere negligence.

173. Additionally, Defendant Brinkman's recklessness and bad faith is evidence by a pattern of allowing male teachers to abuse female students. This includes a recent incident where another male teacher, Justin Daniel Dennis, was indicted for sexual battery of a student over an extended period of time where the District failed to identify or investigate the abuse.

174. It was reasonably foreseeable that Defendants' acts and omissions would cause Jill severe emotional distress.

175. All these acts and omissions by the Defendants have caused Jill severe emotional distress.

**NINTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO DEFENDANT HENRICH**

176. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

177. Defendant Henrich exhibited extreme and outrageous conduct when he engaged in sexually explicit messaging to Jill, a minor, for over an hour on March 20, 2025.

178. By information and belief, Defendant Henrich sent sexually explicit messages to Jill on more than one occasion.

179. Defendant Henrich's acts of sending Jill sexually explicit messages are rendered even more extreme and outrageous by the fact that he both groomed her over the course of three school years and abused his position of authority over her for his own sexual gratification.

180. Defendant Henrich acted completely outside the scope of his employment, with malicious purpose, in bad faith, and in a wanton or reckless manner.

181. Jill has suffered severe emotional distress as a result of Defendant Henrich's actions.

## TENTH CAUSE OF ACTION – LOSS OF FILIAL CONSORTIUM AS TO THE DISTRICT, DEFENDANT HENRICH, DEFENDANT WHITELY, AND DEFENDANT BRINKMAN (BROUGHT BY JANE DOE, INDIVIDUALLY)

182. Plaintiffs incorporate by reference all other allegations contained in this Complaint as if fully set forth herein.

183. This claim is brought by Jane Doe in her own individual capacity, as the parent of the minor child Jill Doe, against Defendants for loss of filial consortium.

184. Under Ohio law, a parent may recover damages, in a derivative action against a third-party tortfeasor who intentionally or negligently causes physical injury to the parent's minor child, for loss of filial consortium. Such consortium includes the services, society, companionship, comfort, love, and solace of the injured child. Gallimore v. Children's Hosp. Med. Ctr., 67 Ohio St.3d 244, 617 N.E.2d 1052 (1993).

185. At all relevant times, Jill was the minor child of Ms. Doe, and Ms. Doe was the custodial and legal parent and guardian of Jill.

186. At all relevant times, Ms. Doe had sole legal custody of Jill.

187. As set forth throughout this Complaint, Defendant Henrich intentionally and tortiously injured Jill, a minor child, by grooming, manipulating, and sexually abusing her over the course of three years.

188. As further set forth throughout this Complaint, the District, Defendant Whitely, and Defendant Brinkman negligently, recklessly, and in bad faith injured Jill by failing to supervise Jill and Defendant Henrich; failing to monitor District apps, accounts, and devices; failing to recognize, investigate, and intervene in obvious signs of grooming and abuse; failing to safely administer medication to Jill; failing to discipline Defendant Henrich or implement an effective safety plan; and allowing Jill to be stigmatized and discriminated against following the abuse.

189. Defendants' intentional and negligent conduct caused physical, psychological, and emotional injury to Jill, a minor child, including severe deterioration of her mental health, social isolation, depression, debilitating anxiety, emotional dysregulation, and an impaired ability to form safe and healthy relationships.

190. As a direct and proximate result of Defendants' tortious injury to her minor daughter, Ms. Doe has been deprived, and will continue to be deprived, of the services, society, companionship, comfort, love, and solace of her daughter. The grooming and abuse of Jill and her resulting injuries have profoundly disrupted and damaged the parent-child relationship between Ms. Doe and Jill.

191. Ms. Doe's claim for loss of filial consortium is a separate and distinct cause of action belonging to her individually, though derivative of the injury to Jill, and is properly joined with Jill's claims in this action.

192. As a direct and proximate result of Defendants' conduct, Ms. Doe has suffered, and will continue to suffer, the loss of the filial consortium of her minor daughter, for which she is entitled to compensation.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

A. Actual damages in an amount to be shown at trial;

B. Compensatory damages in an amount to be shown at trial;

C.  Damages for Jane Doe's loss of the filial consortium of her minor daughter in an amount to be shown at trial;

D.  Punitive damages in an amount to be shown at trial;

E.  Costs incurred in this action and reasonable attorney fees under 42 U.S.C. §1983;

F.  Prejudgment interest; and

G.  Such other and further relief as this Court may deem just and appropriate.

## VII. JURY DEMAND

Plaintiffs request a jury trial on all claims triable to a jury.


Respectfully submitted,

*/s/ Carla Loon Leader*
Carla Loon Leader, #81597
The Law Office of Carla Loon Leader
8717 Tiburon Drive
Montgomery, Ohio 45249
Telephone: (513) 502-3299
Email: carla@cincinnatieducationlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of July 2026, a true and exact copy of the foregoing was electronically filed and served on the following party via certified mail.


Ronald Henrich
10724 Melbury Court
Independence, KY 41051-1102

Lakota Local School District
5572 Princeton Road
Liberty Township, OH 45011-9726


Bill Brinkman
2519 Flemming Road
Middletown, OH 45042

Ashley Whitely
250 Bond Avenue
Hamilton, OH 45011-4218


Ronald Henrich
70 Stableview Cir

Maineville, OH 45039-7914

*/s/ Carla Loon Leader*
Carla Loon Leader, #81597
The Law Office of Carla Loon Leader
8717 Tiburon Drive
Montgomery, Ohio 45249
Telephone: (513) 502-3299
Email: carla@cincinnatieducationlaw.com